**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CYNTHIA SANTIAGO, Administrator of the Estate of Kevante Washington,** | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| v. | : | **NO. 24-5133** |
| **UNITED STATES OF AMERICA,** | : | |
| Defendant. | : | |

**Perez, J.** **August 19, 2026**

**MEMORANDUM**

On May 10, 2023, thirty-one-year-old Kevante Washington was killed by his cellmate while he was incarcerated at the Federal Detention Center in Philadelphia, Pennsylvania (FDC). An FDC officer discovered Washington's cellmate Robert Smith holding his face down on the bunk of their cell, assaulting him. Over the next several minutes, additional staff arrived, restrained Smith and removed him from the cell, then placed hand restraints on Washington while he was unconscious and bleeding from facial and scalp injuries. Once the unconscious, nonresponsive Washington was secured, FDC officers waited for medical staff to arrive without calling 911 or providing any life-saving care until Washington stopped breathing. Staff did not call 911 until fifteen minutes after the assault was discovered, during which time Washington remained unconscious and bleeding. Emergency medical services did not arrive at the cell for an additional four minutes—nineteen minutes after the attack was discovered. They transported Washington to Thomas Jefferson University Hospital, where he died the next day.

Washington's mother, on behalf of his estate, initiated this action against the United States of America, alleging FDC staff were negligent in responding to her son's medical emergency. Generally, the United States is immune from suit, but Congress has waived the Government's

sovereign immunity under the Federal Tort Claims Act (FTCA). That waiver is limited and is subject to several exceptions. The Government invokes the discretionary function exception and moves for dismissal of this case for lack of subject matter jurisdiction. The Government argues that the employee conduct Plaintiff challenges as negligent involved the exercise of discretion which is of the kind that is grounded in social, economic, or political policy. Such conduct would fall within the discretionary function exception, and the Government would retain its immunity from suit.

Where the challenged conduct is governed by a statute or policy issued by the agency or institution, however, the Government's employees have no discretion to violate that rule, and the discretionary function exception does not shield the Government from suit. It is the Government's burden to prove the discretionary function exception applies by establishing that no mandatory policy governed its employees' conduct and that the judgment exercised is subject to policy analysis. The Government has failed at both steps: it failed to produce the governing policy, which created some mandatory requirements for an emergency response; and even assuming no mandatory policy governed the response, the Government identifies no social, economic, or political policy that would govern a decision not to call 911 or provide any medical intervention for seven and ten minutes, respectively, after Washington was restrained and any risk to FDC staff was removed. The Government's motion is, therefore, denied. The denial is without prejudice to the Government renewing its argument at a later stage when it can provide the Court with sufficient information to determine what policy governed, what decisions were made after the cell was secure, and whether those decisions were of the kind that could be grounded in policy.

The Government also moves to dismiss the wrongful death claim for failure to exhaust administrative remedies. The Court agrees with the Government that the administrative claim

submitted to the Bureau of Prisons (BOP) did not identify Washington's wrongful death beneficiaries or any injury they suffered. It described only the injuries to Washington himself. For that reason, the form did not sufficiently put the Government on notice of the wrongful death beneficiaries' claims. The Court, therefore, lacks subject matter jurisdiction over the wrongful death claim in Count II and must dismiss it.

## I. Factual Background

On May 11, 2023, 31-year-old Kevante Washington died after his cellmate at FDC assaulted him in their cell in the Special Housing Unit (SHU). 2d Am. Compl. (SAC) ¶ 1, ECF No. 27. During routine SHU rounds on May 10, 2023, at 3:37 p.m., Officer Hall observed Washington's cellmate Robert Smith kneeling over Washington, holding his face down on the bottom bunk. *Id.* ¶ 9. Washington was unconscious and non-responsive and was visibly bleeding from injuries to his face and head. *Id.* ¶ 10.

At 3:38 p.m., Lieutenant Maynard arrived at the cell and ordered other employees to apply hand restraints to Smith and Washington. *Id.* ¶ 12. For the next minute, prison employees waited for additional staff. At 3:39 p.m., the FDC's Control Center announced a request for staff assistance in the SHU. *Id.* ¶ 17. Prison employees applied hand restraints to Smith and removed him from the cell at 3:40 p.m. After Action Report ("Report"), Def.'s Ex. A, ECF No. 31 at 5;[1] SAC ¶ 16. Officers entered the cell and, at an unidentified time, placed hand restraints on Washington, who remained unconscious and non-responsive.[2] Hall Mem., Def. Ex. C, ECF No. 30-3.

[1] This Memorandum uses the pagination from ECF when citing to the parties' filings or any document on the docket.

[2] According to Officer Hall, after Smith was removed, he and other staff entered the cell and placed Washington in restraints. ECF No. 30-3 at 2. According to the Report, Smith was removed from the cell at 3:40 p.m. ECF No. 31 at 6. One second later, four officers entered the cell. *Id.* Hall did not enter the cell until 3:45:31 p.m. *Id.* It is unclear who placed Washington in restraints and at what time, but between 3:40 and 3:45, the chronology lists a number of officers arriving and exiting the area and the cell and/or standing in the doorway. *Id.*

At 3:52 p.m.—fifteen minutes after discovering Washington unconscious and bleeding—911 was notified. SAC ¶ 17. Shortly thereafter, at 3:52 p.m., SOS Jeremy Thomas and Senior Officer Gregory Henderson (who had left the area five minutes and one minute earlier, respectively) returned to the cell with a gurney and AED. Report at 6–7. The gurney and AED were retrieved from an unspecified location. *See id.* At approximately 3:55 p.m.—eighteen minutes after discovering Washington unconscious and bleeding—FDC employees began CPR.[3] SAC ¶ 21; Report at 7. By that time, Washington's breathing had slowed and his pulse could no longer be detected. SAC ¶ 22; Hall Mem. at 2. The AED was placed on Washington; it did not advise shock. Farrow Mem., Def. Ex. E, ECF No. 30-5 at 2. At 3:56 p.m., emergency medical services arrived. SAC ¶ 24.

Shortly after emergency rescue arrived, FDC staff began escorting Washington from the SHU while continuing to perform CPR. Report at 7. Washington was transported to Thomas Jefferson University Hospital, where he died on May 11, 2023, from complications of multiple injuries, including blunt impact injuries to the head and torso, compression injuries to the neck, and sexual assault trauma. SAC ¶ 26.

Plaintiff attributes Washington's death to a number of failures by the prison: failing to immediately call 911, restraining Washington before providing medical aid, delaying CPR, failing to maintain emergency equipment, inadequately staffing the SHU, failing to conduct required security rounds, and failing to properly position security cameras. *Id.* ¶ 33. In the briefing of this motion, Plaintiff focuses on two main theories, which this Memorandum will refer to as the Delayed Response Theory and the AED Storage Theory.

[3] There is some inconsistency with the timeline at this point. All of the memos— Officer Hall's, Lieutenant Maynard's, and Lieutenant Farrow's—indicate CPR was started while waiting for the AED to arrive, but they provide no specific time. ECF Nos. 30-3, 30-4, 30-5. The Report's chronology indicates the AED arrived before an officer was noted performing CPR. ECF No. 31 (sealed) at 7. This timing dispute is not material to the resolution of this motion.

**Delayed Response Theory:** Plaintiff alleges FDC staff violated mandatory emergency response protocols by prioritizing restraining Washington before providing care, failing to timely call 911, and delaying CPR or other lifesaving care. *Id.* ¶¶ 11, 30–33. The policy establishing the emergency response protocols at the time was BOP Program Statement 6031.04, Patient Care (June 3, 2014) ("2014 BOP Policy"). Neither party provided the 2014 BOP Policy to the Court.

The Government filed Program Statement 6031.05, Patient Care, which took effect on May 14, 2024 ("2024 BOP Policy"), over one year after Washington's death. ECF No. 30-6. It rescinded the 2014 BOP Policy and revised the language governing a four-minute response time. 2024 BOP Policy, Def.'s Ex. F, ECF No. 30-6 at 2. The Government also filed FDC Philadelphia's Institution Supplement PHL 6031.04A (inmate medical/dental care) ("FDC Supplement"), which was in force on the day of the assault. FDC Supp., Def.'s Ex. G, ECF No. 31-2. It establishes local procedures for urgent medical care and must be read with the 2014 BOP Policy. FDC Supp. at 2. The FDC Supplement states: "An emergency response time of four minutes or less is mandatory. Team responders will consist of the following: one medical practitioner, a Lieutenant or his/her designee, and available staff that can be designated to assist." *Id.* at 6. According to the 2024 BOP Policy, "[t]he four-minute response time begins when a medical emergency is identified, and it encompasses the time it takes for employees to be notified and arrive at the emergency scene to begin applicable assessment and administer life-saving interventions when the scene is safe and accessible." 2024 BOP Policy at 22.

**AED Storage Theory:** Plaintiff alleges no AED was accessible in the SHU when the emergency arose. SAC ¶¶ 19, 33.d. The FDC Supplement lists AED locations in the facility, including a specific cabinet in the SHU. FDC Supp. at 7. The Court is without information as to how far away that AED cabinet was from Washington's cell or from where the AED was retrieved.

However, the AED arrived to the cell fifteen minutes after the assault was discovered, and at least seven minutes after Washington was restrained. *See* Hall Mem. at 2 (stating Hall entered cell along with other staff and restrained Washington); Report at 6–7 (showing Hall entering cell for first time at approximately 3:45 p.m. and AED arriving at approximately 3:52 p.m.).

## II. Procedural History

After Washington's death, Plaintiff Cynthia Santiago, Washington's mother and the administrator of his estate, submitted an administrative tort claim to the BOP. SAC ¶ 5. The SF-95 Claim Form she submitted (the "Claim Form") identified the claimant as Cynthia Santiago, Adminstrator [sic] of the Estate of Kevante Washington." Claim Form, Def.'s Ex. J, ECF No. 30-10 at 2. It described the nature and extent of each injury as Washington's violent assault, his resulting broken bones, and his death. *Id.* In the "Amount of Claim" section, in the box labeled "Wrongful Death," it listed "Twelve Million US Dollars." *Id.* (capitalization removed). The administrative claim was denied on April 3, 2024. SAC ¶ 5.

Plaintiff initiated this case on September 25, 2024. ECF No. 1. On November 4, 2025, Plaintiff filed the operative SAC, raising two claims under the FTCA—negligence (Count I) and wrongful death and survival action (Count II). ECF No. 27. On December 31, 2025, Defendant moved to dismiss the SAC for lack of subject matter jurisdiction. ECF No. 30. Defendant attaches a number of documents to its motion, including BOP policies, FDC instructions, and reports of the incident. *Id.*; ECF No. 31. Plaintiff responded in opposition on February 13, 2026. ECF No. 35. Defendant filed a reply on March 2, 2026. ECF No. 37. The motion is ripe for review.

## III. Legal Standard

Sovereign immunity protects the United States from suit without its consent. *White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 456 (3d Cir. 2010). Absent a waiver of sovereign immunity, the Court lacks subject matter jurisdiction over claims brought against the United States. *Id.*; *Merando*

*v. United States*, 517 F.3d 160, 164 (3d Cir. 2008). A district court must dismiss any claims over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3). A party moving to dismiss for lack of subject matter jurisdiction may make a facial or factual attack. A facial attack challenges the sufficiency of the complaint's factual allegations, arguing they do not establish jurisdiction. *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). In evaluating a facial attack, courts accept the complaint's well-pled factual allegations as true and draw every inference in the plaintiff's favor. *Id.*; *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). A factual attack, by contrast, challenges the truth of the facts on which jurisdiction depends. *Aichele*, 757 F.3d at 358; *Mortensen*, 549 F.2d at 891. No presumption of truth attaches to the complaint's allegations, and the Court may weigh evidence from both sides. *Mortensen*, 549 F.2d at 891; *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997). When disputing well-pled jurisdictional facts, the movant must provide contradicting evidence. *See Mortensen*, 549 F.2d at 892 n.17. Where a material jurisdictional fact is genuinely disputed, the Court must try that fact before ruling, *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 177 (3d Cir. 2000), but only after the allegation is controverted, *Mortensen*, 549 F.2d at 892 n.17 ("A factual jurisdictional proceeding cannot occur until plaintiff's allegations have been controverted."). At the motion to dismiss stage, courts should not resolve "genuinely disputed facts . . . when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of the action." *Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir. 2019).

**IV. Discretionary Function Exception**

The FTCA is a limited waiver of the United States' sovereign immunity. *See* 28 U.S.C. § 2674; *Sosa v. Alvarez-Machain*, 542 U.S. 692, 700 (2004). It provides federal district courts with jurisdiction over claims against the United States based on the negligence of federal employees

acting within the scope of their employment. *Sosa*, 542 U.S. at 700 (quoting § 1346(b)(1)). However, the FTCA exempts certain conduct from the waiver, including the discretionary functions. 28 U.S.C. § 2680. The plaintiff ordinarily bears the burden of establishing jurisdiction. *Mortensen*, 549 F.2d at 891. The Government bears the burden of proving the discretionary function exception applies. *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 333 (3d Cir. 2012).

The discretionary function exception bars suits against the United States based upon its employees' "exercise or performance or the failure to exercise or perform a discretionary function or duty . . . , whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). "This discretionary function exception 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Abunabba*, 676 F.3d at 332 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)). The exception "immunizes from second-guessing 'legislative and administrative decisions grounded in social, economic, and political policy.'" *Id.* (quoting *Varig Airlines*, 467 U.S. at 814).

In determining whether the discretionary function exception applies, the Court must first determine exactly what conduct is at issue. *Id.* Then, it performs a two-step inquiry. *Id.* at 332–33. First, it must decide whether the conduct at issue involves an "element of judgment or choice." *Id.* at 333 (citation omitted). "If a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, the exception does not apply because the employee has no rightful option but to adhere to the directive." *Abunabba*, 676 F.3d at 333 (cleaned up). If no specific action is prescribed, the court proceeds to the second step, where it must determine "whether the challenged action or inaction is of the kind that the discretionary function exception

was designed to shield." *Id.* (cleaned up). Courts focus "on the nature of the actions taken and on whether they are susceptible to policy analysis," "not on the agent's subjective intent." *United States v. Gaubert*, 499 U.S. 315, 325 (1991).

**A. Challenged Conduct**

The court must begin its analysis of the discretionary function exception by identifying the challenged conduct. *Abunabba*, 676 F.3d at 333. The challenged conduct here includes:

1. The delayed medical response, in particular the 15-minute period between Officer Hall's initial discovery of the assault and the Control Center's decision to call 911, *see* ECF No. 27 ¶¶ 13–17, the 18-minute period between discovery and beginning CPR or any life-saving measures, *see id.* ¶¶ 21–24, and generally prioritizing restraining the unconscious Washington over providing medical intervention, *id.* ¶ 33.b;

2. The AED and other medical equipment storage, in particular the absence of a stretcher and AED in designated areas within the SHU, *see id.* ¶¶ 18–20, 25.d; and

3. The lack or improper positioning of cameras in the SHU, *id.* ¶ 25.a, the failure to properly conduct security rounds according to established procedures, *id.* ¶¶ 25.b-c, and inadequate staffing, *id.* ¶ 25.f, and the failure to properly document Smith's history of violence, *id.* ¶ 25.i.

Plaintiff does not rely on the theories regarding the stretcher[4] or the conduct identified in the third group above. Plaintiff states in opposition that she "does not ask this Court to second-guess BOP's staffing levels," ECF No. 36 at 19, and raises no arguments pertaining to allegedly improperly conducted rounds or cameras. Accordingly, as noted above, the Court examines Plaintiff's two remaining theories: the Delayed Response and AED Storage Theories.

[4] Plaintiff groups the delay in the stretcher's arrival in with the first category of conduct but does not independently craft an argument related to the stretcher's storage or retrieval. Without a governing policy mandating where the stretcher must be kept, that decision falls within the discretionary function exception. *Santana-Rosa v. United States*, 335 F.3d 39, 43– (1st Cir. 2003).

**B. Judgment or Choice**

To successfully invoke the discretionary function exception, the Government must first show its employees had discretion to perform the challenged conduct. *Clark v. Sec'y of U.S. Navy*, 102 F.4th 658, 661 (3d Cir. 2024). "Once the Government does so, the plaintiff may point to limits on that discretion." *Id.* "If a law, regulation, or policy leaves the agent no meaningful choice, the exception does not apply." *Id.*

**Delayed Response Theory**

With respect to the Delayed Response Theory, the Government points to three policies to show FDC staff had discretion in responding to the emergency at Washington's cell. First, the FDC SHU Special Instructions require responding staff to "take staff safety in consideration first when dealing with emergencies in SHU" and wait for a lieutenant's arrival before entering a cell. ECF No. 30 at 10–11, 16 (quoting SHU Special Instructions, Def.'s Ex. B, ECF No. 31-1 at 7). The SHU Special Instructions provide a list of initial steps to take and repeat that before opening a cell door to provide emergency medical treatment, officers must ensure all inmates are handcuffed. SHU Special Instructions at 7–8. These instructions require an exercise of judgment as to how to appropriately balance staff safety and the provision of emergency medical care. *See Abunabba*, 676 F.3d at 336–37 (explaining that decision whether to post warning signs required weighing of potential benefits of additional warnings against the cost of such warnings).

Second, the Government points to the 2024 BOP Policy, which provides for a four-minute response time to medical emergencies. ECF No. 30 at 17 (quoting 2024 BOP Policy at 22). The Government argues that, although the 2024 BOP Policy "provides for a four-minute response time to medical emergencies, it provides no specifics about when 911 is to be called, when first aid is to be administered, or when CPR is to begin." ECF No. 30 at 16. However, the 2024 BOP Policy

was not in effect when Washington was killed, and it revised the four-minute response requirement that controlled the response that day. ECF No. 30-6 at 2. The Court does not have the 2014 BOP Policy to determine whether the 4-minute language was mandatory or discretionary, what response was required within that time, or which employees were required to follow it.[5]

Third, the Government points to two FDC Supplements (inmate medical/dental care and serious illness & death) and argues they "contain no additional pertinent directives." ECF No. 30 at 17. The FDC Supplement pertaining to medical care states that its purpose is to create procedures for responding to urgent medical needs and that it must be read together with the 2014 BOP Policy. FDC Supp. at 2. It further provides: "An emergency response time of four minutes or less is mandatory" and that a lieutenant and one medical practitioner must respond. *Id.* at 5–6.

Without the 2014 BOP Policy, which contained a 4-minute response requirement, the Government has not shown its employees had discretion to perform the challenged actions as they did. The 4-minute response was mandatory and a medical practitioner and lieutenant had to be part of the responding team. FDC Supp. at 5–6. The Court cannot know what else, if anything, the 2014 BOP Policy required. Thus, the Government has failed to show its employees had discretion to, for example, wait to call 911 while Washington lay unconscious and bleeding for fifteen minutes after discovery or, more concerningly, for at least seven minutes after he was placed in hand

[5] The Fourth Circuit has interpreted the 4-minute response language in the 2014 BOP Policy as mandatory. *Tyree v. United States*, 814 F. App'x 762, 767 (4th Cir. 2020). In comparing the 2014 four-minute response language to a different policy requiring employees to respond "immediately, effectively, and appropriately," the court explained that a deadline requiring action within a specified time leaves nothing for an employee to interpret and, therefore, leaves no discretion to that employee. *Id.* However, it did not quote enough of the policy for this Court to determine how it would have applied here. The court also noted that the 2014 BOP Policy appeared to apply only to medical professionals, not BOP correctional officers. *Id.* at 768 n.8. However, it was unclear from the face of the policy, and the plaintiff did not allege staff violated it. *Id.* The Court will not resolve this dispute at this stage because the Government's failure to produce the relevant policy at all does not controvert Plaintiff's allegations that a mandatory policy controlled. *See Mortensen*, 549 F.2d at 892 n.17.

restraints and any threat to officer safety was removed. *See Clark*, 102 F.4th at 661 ("First, the Government must show that the agent had discretion to act.").

Plaintiff alleges FDC employees violated mandatory emergency response protocols. ECF No. 27 ¶¶ 11, 30–33. Although the SAC does not name a mandatory policy, Plaintiff's opposition brief invokes the 2024 BOP Policy's four-minute response language as a limit on FDC employees' discretion. ECF No. 36 at 10–11. Plaintiff's allegations, combined with the FDC Supplement and the various references to the 2014 BOP Policy, support an inference at this stage that FDC staff were required to respond to Washington's medical emergency within 4 minutes. What that response must have consisted of cannot be determined at this point.

It is the Government's burden to prove the discretionary function exception applies, *Abunabba*, 676 F.3d at 333, and the Government has failed to controvert Plaintiff's jurisdictional allegations, *see Clark*, 102 F.4th at 661. The Court need not accept the Government's characterization of a policy that is not before the Court. *See Parrott v. United States*, 536 F.3d 629, 637–38 (7th Cir. 2008) (rejecting Government's "unsupported statement" as to contents of a separation order as insufficient to establish absence of mandatory directive about with whom plaintiff could be housed; if a mandatory separation order was in place, the discretionary function exception could not apply). Consequently, the Government failed to meet its burden of providing evidence to contradict Plaintiff's allegations establishing FDC staff failed to comply with established emergency procedures. *See Schingler v. United States*, No. 13-CV-01388, 2014 WL 980804, at *8 (M.D. Pa. Jan. 23, 2014) (recommending denial of motion to dismiss where the Government presented no evidence supporting its contention that decision when and how to intervene in an inmate-on-inmate assault was discretionary), *R. & R. adopted in relevant part*, 2014 WL 980757, at *6–7 (W.D. Pa. Mar. 13, 2014). Indeed, the evidence the Government did provide—

the FDC Supplement—supports Plaintiff's mandatory 4-minute response theory. *See* FDC Supp. at 6 ("An emergency response time of four minutes or less is mandatory.").

**AED Storage Theory**

With respect to the AED Storage Theory, the Government points to the FDC Supplement as providing guidance for the locations of AEDs at the FDC. ECF No. 30 at 19 (discussing FDC Supplement). The FDC Supplement provides that an AED is kept in a specific cabinet in the SHU. FDC Supp. at 7. The Government argues this merely "identifies the locations of AEDs within the facility but does not mandate that those locations be used into the future." ECF No. 30 at 20.

The Government relies on two cases, which show that a decision about where to store equipment involves judgment when there is no policy mandating it be stored in a specific location. *See Kogut v. United States*, 573 F. Supp. 3d 1277 (N.D. Ill. 2021); *Santana-Rosa v. United States*, 335 F.3d 39 (1st Cir. 2003). These cases are distinguishable. *Kogut* involved the location of a cell key for which the parties pointed to no statute, regulation, or policy governing its location. 573 F. Supp. 3d at 1289. The court applied the discretionary function to the decision to keep the key nine floors away from the SHU because no directive required the key to be kept in any specific place. *Id. Santana-Rosa*, meanwhile, involved the storage of a "sweeping brush," which an inmate used as a tool to assault another inmate. 335 F.3d at 40. The court pointed to a relevant BOP program statement and institutional plan "outlin[ing] broad guidelines for occupational safety and facility sanitation, without any explicit controlling directives." 335 F.3d at 43. Without such a controlling directive, staff had discretion to decide where to store the tool. *Id.* Here, unlike *Kogut* and *Santana-Rosa*, the FDC Supplement does provide for the AED's specific location. The Government has identified no applicable case law establishing that the FDC Supplement's designation of that location left FDC staff with the discretion to place it elsewhere.

Indeed, in its reply, the Government "does not dispute that [the FDC Supplement] identifies the then-current locations of AEDs at the FDC." ECF No. 37 at 6. The Government's reply focuses first on the FDC's discretion to choose that location in the first place and second on the Plaintiff's inability to allege where the AED was actually kept. *Id.* With respect to the first argument, Plaintiff does not challenge the decision to select the cabinet in the SHU officer's station as the AED's location; she challenges the noncompliance with that decision after it was made. Once an institution adopts a mandatory directive, its employees have "no rightful option but to adhere to the directive." *Gaubert*, 499 U.S. at 322.

With respect to the second argument regarding the sufficiency of the allegations, Plaintiff is limited by what information she has access to. The SAC alleges the AED was not kept where it was required to be, and the Government's evidence establishes the AED was not brought to the cell for fifteen minutes. This is sufficient to raise an inference that it was not in the SHU where it was supposed to be. Where the AED was kept is information completely within the Government's control and is a question for discovery. The Court will not resolve such a factual dispute at this stage. *See Davis*, 824 F.3d at 348 (explaining that courts should not resolve "genuinely disputed facts . . . when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of the action").

The Government has failed to show its employees retained discretion to keep the AED anywhere other than the location prescribed by the FDC Supplement or to delay providing any medical intervention for well over four minutes after Washington was restrained. For that reason, the motion to dismiss is denied.

### C. Nature of the Actions

The Government's motion fails at step one, so the analysis could end there. The Court proceeds to step two, however, because the Government has not met its burden to show the decisions made (if any) were of the kind that may be subject to policy analysis. Even if the controlling policies left employees discretion over the timing of the medical response or the AED storage, the exception applies to that judgment only if it was grounded in social, economic, or political policy. *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988); *Gaubert*, 499 U.S. at 325. The Government bears the burden on this step as well. *Abunabba*, 676 F.3d at 333.

**Delayed Response Theory**

Even if no policy directive required FDC staff to perform any specific act, like calling 911, initiating CPR, or providing other emergency medical care within a certain period of time, the Court must determine whether those kinds of decisions are of the kind that are shielded by the discretionary function exception. Several circuits have held that ordinary judgments involving the provision of medical care based on a determination of an injured person's health do not implicate any social, economic, or political policy. *E.g.*, *Fang v. United States*, 140 F.3d 1238, 1242 (9th Cir. 1998) (finding district court erred in dismissing claims based on decision not to stabilize injured plaintiff's spine and failure to render proper CPR because those were "ordinary judgment[s] made by EMTs in applying their training and expertise to an emergency situation," which do not implicate social, economic, or political policy); *Whisnant v. United States*, 400 F.3d 1177, 1183 (9th Cir. 2005) ("[A] failure to adhere to accepted professional standards is not susceptible to a policy analysis."); *Anestis v. United States*, 749 F.3d 520, 529 (6th Cir. 2014) ("The determination of a healthcare professional or an in-take clerk as to the emergency state of a patient would not involve a consideration of public policy, but rather, only a consideration of the patient's health,

and the discretionary function exception is designed to protect only public policy considerations."); *Beins v. United States*, 695 F.2d 591, 614 (D.C. Cir. 1982) (Robinson, C.J., concurring) ("Ordinarily, medical decisions do not involve any consideration of public interests or policy; normally, they are predicated upon factors having medical value only."); *Lather v. Beadle Cnty.*, 879 F.2d 365, 368 (8th Cir. 1989) ("Where only professional, nongovernmental discretion is at issue, the discretionary function exception does not apply."). The Third Circuit has not directly weighed in on whether the discretionary function exception applies to decisions involving ordinary judgments made in response to an emergency that do not implicate policy. However, this Court is persuaded by the reasoning from other circuits.

The Court does not disregard that FDC staff had to balance competing interests to protect staff safety. However, even the policies submitted by the Government show that the need for such balancing lasts until the scene is secure. When Smith was restrained and removed and Washington was restrained and unconscious, the potential threats to officer safety were removed. Even accepting the latest time when Washington may have been restrained—when Hall entered the cell at 3:45 p.m.—there is no explanation for why FDC staff took no action for ten minutes while Washington lay unconscious and bleeding with his hands presumably restrained behind his back. During those ten minutes, it does not appear that any decision was made, let alone one involving an exercise of judgment susceptible to policy analysis. A decision to do nothing and "wait for medical" in a secure location with no risk to staff, rather than providing some kind of care or at the very least calling for emergency medical care, is the kind of professional, nongovernmental discretion that falls outside the discretionary function exception's shield. *See Anestis*, 749 F.3d at 529.

**AED Storage Theory**

Decisions about where to store equipment or whether to bring it to a certain location are generally shielded by the discretionary function exception. Nonetheless, the Government has not identified any decision that was made with respect to the AED being stored in any location. Thus, there remains a question of whether any decision was made to put the AED in a location other than what was indicated in the FDC Supplement or whether the AED was inadvertently stored in the wrong location due to laziness, due to some prioritization of a previous emergency, or for some other reason. *See Stiward v. United States*, 551 F. Supp. 2d 478, 498 (E.D. La. 2008) (finding discretionary function exception did not apply to failure to stock insulin on ship where no justification was given for why crew waited until after departure to request replacement or why requisition orders were not fulfilled because "no policy decision was ever made not to stock insulin"); *see also Martin v. United States*, 605 U.S. 395, 417–18 (2025) (Sotomayor, J., concurring) (noting Circuit split with regard to "whether the [discretionary function] exception applies when the challenged act was careless rather than a considered exercise of discretion"); *Xi v. Haugen*, 68 F.4th 824, 843 (3d Cir. 2023) (Bibas, J., concurring) (citations omitted) (same and explaining the Eighth, Ninth, and Tenth Circuits find carelessness is covered by the exception, while the Second, Fourth, and Seventh Circuits find carelessness is outside the exception). The Third Circuit has not decided whether any actual exercise of discretion is required to invoke the discretionary function exception. *See Xi*, 68 F.4th at 843. However, "conduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Accordingly, without some decision to evaluate, the Court cannot determine whether it was of the kind that is susceptible to policy analysis.

For these reasons, the Government's motion fails at step two.

## V. Exhaustion of the Wrongful Death Claim

The Government moves to dismiss the wrongful death claim because it interprets the SAC as asserting the claim in Santiago's own right as opposed to as the administrator of Washington's estate. The Government argues she is not the appropriate wrongful death beneficiary and she did not exhaust the claim in her own right. The Court agrees but notes that although Santiago is not a wrongful death beneficiary, she is the proper plaintiff as administrator of Washington's estate.

In an FTCA claim, the law of the state where the tort occurred controls. 28 U.S.C. § 1346(b)(1). Pennsylvania's Wrongful Death Act allows a decedent's spouse, children, or parents to recover damages for his death caused by another's negligence. 42 Pa. C.S. § 8301. These damages are separate from and may be recovered in addition to damages in a survival action. *Tulewicz v. Se. Pa. Transp. Auth.*, 606 A.2d 427, 431 (Pa. 1992). Washington's wrongful death beneficiaries are his three children, 42 Pa. C.S. § 8301(b); 20 Pa. C.S. § 2103(a)(1), but their claims must be brought by the representative of the estate. *Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 259 (Pa. Super. Ct. 2017). Plaintiff does not argue otherwise. Nonetheless, if the wrongful death claim was properly exhausted, Plaintiff would be the appropriate party to bring it, as administrator of Washington's estate on behalf of his children. The Court, therefore, turns to the exhaustion question.

Before bringing an FTCA claim in federal court, a plaintiff must first present all her claims to the appropriate federal agency. 28 U.S.C. § 2675(a); *Freeman v. Lincalis*, 158 F.4th 166, 176 (3d Cir. 2025). This is a jurisdictional requirement. *Shelton v. Bledsoe*, 775 F.3d 554, 569 (3d Cir. 2015). The administrative claim need not anticipate every legal theory the claimant may later assert, but it must give the agency enough information to investigate the claims and determine its possible liability. *Bialowas v. United States*, 443 F.2d 1047, 1050 (3d Cir. 1971); *Tucker v. U.S. Postal Serv.*, 676 F.2d 954, 959 (3d Cir. 1982). It must also inform the agency of which individuals

intend to pursue claims, because without that information, "a federal agency cannot conduct a proper investigation or evaluate realistically each claims' potential for settlement.'" *Diawara v. United States*, No. 18-3520, 2019 WL 1489870, at *3 (E.D. Pa. Apr. 4, 2019) (quoting *Jensen v. United States*, No. 09-2977, 2009 WL 4117357, at *4 (E.D. Pa. Nov. 24, 2009)) (dismissing loss of consortium claim for failure to exhaust where decedent's spouse identified himself on claim form but did not identify loss of consortium claim or describe such injuries). "If multiple claimants or claims exist from one single incident, each claimant must individually satisfy all jurisdictional requirements." *Id.* at *2.

Santiago asserts her claims as the administrator of Washington's estate in both the Claim Form and in this case. ECF No. 30-10 at 2; ECF No. 27 at 1. The Claim Form provides the factual basis for the claim in the box titled "PERSONAL INJURY/WRONGFUL DEATH," describing the allegedly negligent conduct of the prison staff, the violent assault, and Washington's injuries and death. Claim Form at 2. Under "AMOUNT OF CLAIM," in the box labeled "12.c. WRONGFUL DEATH," Plaintiff wrote "Twelve Million US Dollars." *Id.* The Claim Form does not name Washington's children, reference their existence, or identify any harm they suffered. *Id.* at 2. Nor does it identify any injuries to Santiago in her own right. *Id.*

The Government cites two cases from this District, which are persuasive. ECF No. 30 at 24. *Gland v. United States* involved claims brought by a plaintiff suing both as administratrix of her husband's estate and in her own right. No. 03-CV-1697, 2003 WL 23094911, at *2 (E.D. Pa. Dec. 16, 2003). Her Form 95 named the claimant as the estate and stated separate figures for damages for the estate's personal injury claim and the wrongful death claim, but it did not identify any injuries to the plaintiff herself. *Id.* at *3. The court held that the lack of any mention of injuries to the plaintiff made the form insufficient to give the government notice of her individual wrongful

death claim. *Id.* In so holding, the court rejected the plaintiff's argument that "by stating a figure for her wrongful death claim, in addition to her signature, she provided the Government with sufficient constructive notice" of the wrongful death claim asserted in her own right. *Id.* at *3–4. The court reasoned that "[m]ere reference" to a wrongful death cause of action, without any description of injury to the wrongful death beneficiary, is not enough. *Id.* at *4 (discussing *Frantz v. United States*, 791 F. Supp. 445, 451–52 (D. Del. 1992)). The court dismissed the wrongful death claim brought in the plaintiff's own right and allowed the estate's survival claim to proceed. *Id.*

The plaintiff in *Weeks v. United States* also sued in two capacities: as administratrix of her son's estate and in her own right as his mother. No. 25-187, 2025 WL 3230712, at *1, *3 (E.D. Pa. Nov. 19, 2025). Her Form 95 listed her as administratrix and did not describe injuries to herself or name any claims she would assert in her own right. *Id.* at *3. Citing *Gland*, the court dismissed the wrongful death claim she brought in her own right and let the estate's claims proceed. *See id.* at *1, 5.

Here, too, Plaintiff's Claim Form did not identify Washington's beneficiaries or describe any injuries they or Santiago personally suffered. A wrongful death beneficiary may be entitled to damages for their own losses. Without identifying Washington's children at all, the Claim Form did not put the Government on notice of their claims. The addition of individual children who would be entitled to their own damages separate from those recoverable under the Survival Act "alters factors materially affecting settlement, including valuation of the claim, investigation of the underlying events, and the applicable law." *Diawara*, 2019 WL 1489870, at *5. Thus, merely putting a number in a box titled "wrongful death" "does not provide sufficient notice of multiple claims or claimants addressed on a single form, even when the claims arise from the same factual occurrence." *Gland*, 2003 WL 23094911, at *4.

Plaintiff argues that, even if the wrongful death claim is not exhausted now, the appropriate course of action is not to dismiss but to stay the case, pending exhaustion. ECF No. 36 at 22. The Government responds that such an approach is unworkable and that the statute of limitations for submitting an administrative claim expired in May 2025. ECF No. 37 at 8 (citing 28 U.S.C. § 2401(b)). 28 U.S.C. § 2401(b) provides that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . ." The FTCA's time bars are "just time limits" subject to equitable tolling. *United States v. Wong*, 575 U.S. 402, 412 (2015); *D.J.S.-W. ex rel. Stewart v. United States*, 962 F.3d 745, 750 (3d Cir. 2020). Whether Plaintiff may still exhaust the wrongful death claim, or whether the claim is barred by the statute of limitations is not fully briefed. The Court will, therefore, dismiss the wrongful death claim without prejudice.

At this stage, the Court also declines to stay the survival claim. This case has been pending since 2024, and the Court sees no reason to continue to delay discovery into the negligence claim.

## VI. The Survival Claim

Finally, the Government argues the survival claim in Count II should be dismissed because it is duplicative of the negligence claim in Count I. As an initial matter, Rule 12(b)(1) is not the appropriate vehicle for this argument, and the Government does not invoke any other Rule. *See Davis*, 824 F.3d at 348–49 (explaining that Rule 12(b)(1) governs motions for dismissal for lack of subject matter jurisdiction and distinguishing the standards governing 12(b)(1) motions and 12(b)(6) motions, including that Rule 12(b)(1) places the burden of persuasion on plaintiff and allows defendant to dispute the alleged facts while Rule 12(b)(6) does not). Two rules would be more appropriate for this argument: Rule 12(f) gives the court discretion to strike redundant matter from a pleading, and Rule 12(b)(6) allows for dismissal for failure to state a claim. Nonetheless, the Court will not dismiss the survival claim under any standard.

The Government is correct that the Survival Act does not create a new cause of action; rather, it allows a claim the decedent could have brought himself to survive his death. 42 Pa. C.S. § 8302; *Tulewicz*, 606 A.2d at 431. The Government argues the FTCA is the vehicle through which Washington could have brought his negligence claim had he survived. ECF No. 30 at 25. However, it does not establish the FTCA negligence claim would survive Washington's death absent state law creating such a rule. Under Pennsylvania law, the Survival Act is the vehicle through which Washington's estate may recover damages for the harm he suffered due to the Government's alleged negligence. *See Corbin v. Bucks Cnty.*, 703 F. Supp. 3d 527, 539–40 (E.D. Pa. 2023) (explaining that Pennsylvania's Wrongful Death Act and Survival Act do not create substantive causes of action but provide vehicles through which plaintiffs may recover, and consulting state law to determine validity and scope of deceased plaintiff's § 1983 claim). The Court will, thus, read Counts I and II together as one negligence claim brought through the Survival Act. The Government's motion to dismiss the survival claim is denied.

## VII. Conclusion

For the foregoing reasons, the Court denies the Government's motion with respect to Count I and the survival action in Count II. This denial is without prejudice to the Government's ability to renew its jurisdictional arguments with the correct policies and explanations as to what decisions were actually made where a policy-based exercise of judgment could have been involved. The Court dismisses the wrongful death claim without prejudice. If appropriate at a later date, the Court will consider arguments relating to whether Plaintiff's efforts to administratively exhaust that claim may be effective given the expiration of the limitations period.

An appropriate Order follows.